[No. B160567. Second Dist., Div. Four. May 20, 2003.]

In re ALVIN R., JR., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
ALVIN R., SR., Defendant and Appellant.

## COUNSEL

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel, and Arezoo Pichvai, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**HASTINGS, J.**—Appellant, Alvin R., Sr. (father), appeals determinations made by the juvenile court at a review hearing that he had been afforded reasonable reunification services in an attempt to regain custody of his son, Alvin R., Jr. (Alvin), and that it would be detrimental to return Alvin to his father's home at that time. After review of the record, we conclude substantial evidence supports the findings of the juvenile court that the plan adopted for reunification was reasonable, father fully cooperated and complied with all aspects of the plan, and it would have been detrimental to return Alvin to his father's home at the time. But we disagree with the juvenile court's finding that the Los Angeles County Department of Children and Family Services (the Department) provided reasonable services to effectuate the plan.

The key to the original reunification plan was that father and Alvin participate in conjoint counseling, but only after Alvin had received eight sessions of individual counseling. The Department effectively abdicated its responsibility to effectuate timely individual counseling for Alvin, which precluded father from participating in conjoint counseling sessions with Alvin. The juvenile court became aware of the delay and ordered that conjoint counseling proceed, when appropriate, even if Alvin had not completed eight individual counseling sessions. The Department again failed to take timely steps necessary to have father and Alvin begin conjoint counseling. The resulting delay effectively precluded any meaningful visitation

between father and Alvin while the statutory time periods contemplated for completion of the reunification process were running.

We therefore reverse the finding of the trial court that reasonable reunification services were provided and affirm the other findings.

## BACKGROUND

Alvin was first detained in 1996 at the age of seven, along with his half siblings, due to mother's neglect. His parents, who did not live together, had joint custody of Alvin at that time, pursuant to a family court order. Alvin was released to his father, and in early 1997, he was adjudicated a dependent of the juvenile court and placed in his father's home under the supervision of the Department. Jurisdiction was terminated in mid-1997 with regard to Alvin, and he remained with his father.

In July 2001, when he was 11 years old, Alvin refused to return to his father's home after visiting his mother, and ran away for a short time in order to avoid going back. He was again detained, this time in the home of his maternal grandmother, where his older half sister had been placed under a permanent plan pursuant to Welfare and Institutions Code section 366.26. The Department filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b), alleging that father had, on numerous occasions over the past nine years, physically abused Alvin by whipping him with a belt, causing welts and bruises on his body; that father had allowed his girlfriend Kimberly to physically abuse Alvin by striking him with a belt; and that father had allowed Kimberly to use drugs in the home, in the minor's presence.

Adjudication was set for August 15, 2001. At that time, the court ordered the matter to mediation and continued adjudication to August 30, 2001. On August 30, 2001, pursuant to the mediation agreement, the parties agreed to the sustaining of an amended petition upon father's plea of no contest, and they agreed to a case plan. The amended petition alleged more simply that father had on prior occasions, including in 2001, physically disciplined the minor by hitting him with a belt, causing him unreasonable pain and suffering, and that father created a detrimental home environment by allowing Kimberly to physically discipline the minor, placing him at risk of severe physical and emotional harm. Allegations of bruises, welts, and drugs were eliminated.

Father was ordered to be in counseling and attend parent education. The juvenile court also ordered that Alvin undergo weekly individual counseling

with a licensed therapist, and conjoint counseling with father when his therapist deemed it appropriate or upon court order, to be addressed after eight individual sessions. Alvin was to continue to live with his maternal grandmother, and monitored visits with father would be allowed, to be liberalized in the Department's discretion. Kimberly was not to be the monitor, and visits with Kimberly would be allowed only with Alvin's consent. The Department was ordered to provide reunification services.

A contested disposition hearing was set for October 10, 2001. On that date, however, the court was informed that the setting was in error, and disposition was not contested. Disposition was therefore set over to October 22, 2001, and on that date, Alvin was adjudicated a ward of the juvenile court.

At the hearing of October 22, 2001, the court again ordered family reunification services. It also again ordered that father attend parent education and counseling, and that he and Alvin participate in conjoint counseling upon his therapist's approval or court order, after Alvin completed eight individual counseling sessions. The court ordered the Department to assist Alvin's caretaker in enrolling him in counseling, and to use funds under Welfare and Institutions Code section 370, if necessary. Monitored visits were again ordered, with Alvin's consent to be taken into consideration when scheduling visits, and Kimberly was not to be a monitor.

The court then set a six-month review hearing, pursuant to Welfare and Institutions Code section 366.21, subdivision (e), for April 17, 2002. Father asked for an earlier, interim review hearing. He reported to the court that he would complete his parenting course the next day, and that he was in individual counseling, but was concerned that Alvin had not begun his individual counseling. The court granted the request and scheduled a progress report for January 22, 2002.

On January 22, 2002, father reported that Alvin had undergone just one counseling session, and asked the court to order that the eight initial sessions must be completed by the next hearing date, which was the six-month review, scheduled for April 17, 2002. His attorney informed the court that father would be contesting the adequacy of reunification services at that time.

It also came to the court's attention on January 22, 2002, that Alvin had had no visits with father, because each month since October 2001, Alvin had expressed a desire not to see him, telling the social worker that he was not yet ready. The court therefore ordered that the minor be encouraged to visit

with his father, and acknowledged that conjoint counseling was necessary for that purpose, stating, "It looks as though until conjoint starts, this minor is not going to be willing to have visits." The minor's attorney offered to speak to Alvin and his grandmother about visits, and to confer with other counsel.

Counsel for the Department explained to the court why it had taken so long to get Alvin started in individual counseling. The maternal grandmother wanted a therapist close to her home, since she felt somewhat overwhelmed with two children engaged in activities in different parts of town. It took time to find a licensed therapist nearby and for the maternal grandmother to take Alvin to sign him up. Counsel for the Department explained, "Apparently, this was the only therapy center close to the maternal grandmother's home. And so by the time she got around to . . . doing it and by the time they signed it, it literally took that long."

The court suggested to the Department that an explanation of the Department's reasonable efforts with regard to Alvin's counseling be included in its next report, and ordered that conjoint counseling begin as soon as Alvin's therapist deemed it appropriate, regardless of the number of individual sessions completed.

Apparently unaware of that order, the social worker notes in his report prepared for the hearing of April 17, 2002, "that in order for the minor to have 8 completed sessions and for conjoint counseling to start, more time is needed. The court is respectfully referred to the attached letter from Ms. Jules Taitesel." In the attached letter, Taitesel states that Alvin had completed just three individual therapy sessions. There is no mention of conjoint therapy. The report explains that one session was cancelled for Good Friday, and others were not scheduled due to Alvin's transferring to a new school. Thus, conjoint counseling had not begun.

The court found the report insufficient, ordered the Department to prepare a full report, and continued the hearing to May 20, 2002. The report prepared for the hearing of May 20, 2002, states that Alvin had completed five therapy sessions, but the social worker again expressed the belief that eight sessions were required before conjoint counseling could begin. It was also reported that Alvin was no longer receiving tutoring services due to a lack of funding, but that he was adjusting well with his maternal grandmother, and had expressed a wish to stay with her. Father was reported to be in

compliance with the "permanent plan" and the court's orders, including the completion of a parenting course the previous fall.[1]

Father's therapist reported that father was ready to begin conjoint counseling. The Department recommended that Alvin's placement continue unchanged, and that the court schedule a 12-month review pursuant to Welfare and Institutions Code section 366.21, subdivision (f), for the following October. Although it was not stated in the report, counsel for the Department explained at the hearing that it was recommending that family reunification services be provided to father for an additional six months.

Unhappy with his few visits and the lack of progress toward conjoint counseling, father again asked that the matter be set for a contested hearing. The court set it for June 7, 2002, and ordered that father have at least one two-hour monitored visits per week and that conjoint counseling begin immediately with the minor's therapist. By June 7, 2002, the first conjoint counseling session had been scheduled for the following week.

Alvin testified with regard to the whippings he received from father and Kimberly when he lived with them, and how they made him feel that his father did not love him. He told the court that he did not want to go back to live with his father, because he was afraid that he would find himself in the same predicament, although he now believed that his father loved him, because he was fighting to get him back.

When asked if he would like to see more of his father, Alvin replied that he did not really know. He testified that he was worried that if he went back to living with his father, he would not be permitted to see his mother as much as he is now, which is every weekend. That was "most definitely" not the only reason, however, that he did not want to live with his father. Above all, Alvin wanted to remain with his grandmother. He said, "She gives me hope. And . . . everybody else bribes me. I love my grandma. I want to live with her, plus my sister's there. I want to stay with them."

Social worker Kent Bennett testified that he was assigned to the case in July 2001, and knew on October 22, 2001, that reunification services had been ordered, when he reviewed a copy of the court's minute order of the same date. He said that the reunification services the Department provided were based upon that minute order.

Bennett admitted that he was mistaken regarding what allegations had been sustained. He had never seen a copy of the mediation agreement with

---

[1]The report was in error, since there had been no permanent plan ordered for Alvin, and the proceedings were not yet at that stage. Alvin's half sister was living with the maternal grandmother under a permanent plan, but her father was not Alvin's father.

the amended allegations, and he therefore continued to repeat the original allegations in each of his reports. After Bennett read the mediation agreement to himself in court, he testified that he would not have done anything differently.

Further, Bennett testified that he thought that the present visitation order was appropriate, and he would liberalize visitation only in the discretion of the minor, or upon the recommendation of Alvin's therapist. Bennett conceded that reunification would be very difficult without conjoint counseling. It was his belief throughout the proceedings, however, that Alvin was required to have eight individual therapy sessions before starting conjoint counseling. He explained that it took so long to get Alvin into therapy because he was on a waiting list, and when an appointment was finally made, it conflicted with the maternal grandmother's and the half sister's schedules. Bennett testified that he was of the opinion that there was a substantial risk to Alvin's emotional well-being if returned to his father at that time, because he did not want to live with his father.

Father testified that he and Kimberly had completed a parenting course, had learned disciplinary techniques that did not involve hitting. He had implemented the techniques with his other children, who "pretty much adore" him, and who jump into his arms when they see him. He did not want to force Alvin to come home, but was unhappy that he had had only three visits with him, even though he had done everything required of him.

The juvenile court found that returning Alvin to his father would create a substantial risk of detriment to his physical or emotional well-being, making continued jurisdiction necessary.[2] The court found by clear and convincing evidence that father had complied with the case plan and that reasonable reunification efforts had been made, but ordered six additional months of reunification services. In addition, the court ordered that Alvin remain placed with his maternal grandmother, and set a 12-month review pursuant to Welfare and Institutions Code section 366.21, subdivision (f), on December 6, 2002. Father filed a timely notice of appeal from the order entered June 7, 2002.

## DISCUSSION

Father contends that the juvenile court erred in finding that reasonable reunification services had been provided, and he contends that this court may, in its discretion, undertake an independent review of the evidence, because the facts are undisputed. He relies upon *Rosa S. v. Superior Court*

---

[2] See Welfare and Institutions Code section 366.21, subdivision (e).

(2002) 100 Cal.App.4th 1181 [122 Cal.Rptr.2d 866], in which the appellate court exercised its discretion to consider an issue even though it may have been waived in the trial court, because the issue was purely a question of law. The issue there was "whether a parent is precluded from receiving reunification services solely because she received 18 months of services in a previous dependency proceeding where she successfully reunified with her child." (*Id.* at p. 1188.) The court did not hold that independent review of a contested issue is permitted whenever the evidence is not in substantial conflict.

■ When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 [42 Cal.Rptr.2d 755].) " 'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.' " (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].) Even if there is no substantial conflict in the evidence, we must nevertheless draw all legitimate inferences in support of the findings of the juvenile court. (*Id.* at p. 820.)

■ A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306 [36 Cal.Rptr.2d 910].) "When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact. [Citations.]" (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75 [82 Cal.Rptr.2d 493].)

When applying the substantial evidence test, however, we bear in mind the heightened burden of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 [54 Cal.Rptr.2d 722].) "Under this burden of proof, 'evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' [Citation.]" (*In re Monica C., supra,* 31 Cal.App.4th at p. 306.)

The trial court found that reasonable services had been provided "based on the attempt . . . to get the child into counseling by January 18th. . . . There is no question that it took so long, but apparently it was the grandmother, not the Department." Thus, the court found, in essence, that services were

reasonable because Alvin's first appointment was accomplished within five months after the first order for individual and eventual conjoint counseling, and because the delay was caused by the grandmother.

■ Visitation is an essential component of any reunification plan. (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580 [114 Cal.Rptr.2d 499].) To promote reunification, visitation must be as frequent as possible. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679 [52 Cal.Rptr.2d 53].) Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification. (See *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138 [106 Cal.Rptr.2d 465]; see also *In re Julie M.* (1999) 69 Cal.App.4th 41, 49-51 [81 Cal.Rptr.2d 354].)

Conjoint therapy was surely critical here. Alvin had refused visitation for four months, and both the court and the social worker recognized that visitation would probably not take place without conjoint therapy. Nevertheless, in the Department's first interim review report, filed nearly five months after reunification efforts should have begun, the Department did not even address its efforts to get Alvin into counseling. Its first mention of the issue came during the hearing of January 22, 2002, when counsel for the Department represented to the court that the maternal grandmother had scheduling problems, felt overwhelmed, had insisted upon a therapist close to home, and did not get around to signing Alvin up for a long time. Then, in spite of the juvenile court's suggestion that the Department include an explanation of its reasonable efforts in its next report, no additional information was ever given. Finally, the social worker offered no additional explanation in his testimony.

■ Thus, we must determine whether evidence establishing that the maternal grandmother had scheduling problems, felt overwhelmed, had insisted upon a therapist close to home, and did not get around to signing Alvin up for a long time, is sufficient to support a finding that reasonable reunification services were provided. As we shall explain, we conclude that it is not.

■ Reunification services need not be perfect. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [78 Cal.Rptr.2d 311].) But they should be tailored to the specific needs of the particular family. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 810 [41 Cal.Rptr.2d 731].) Services will be found reasonable if the Department has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents

in areas where compliance proved difficult (such as helping to provide transportation . . .)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [286 Cal.Rptr. 592], italics omitted.)

The maternal grandmother's schedule and her insistence upon a therapist near her home were a major obstacle to any reunification efforts. Nevertheless, the Department's only effort to overcome this obstacle was apparently to make a referral to a therapist who had no time available to see Alvin. There was no evidence that the Department made an effort to find other therapists in the area, or that the Department attempted to find transportation for Alvin to see an available therapist further away. *Some* effort must be made to overcome obstacles to the provision of reunification services. (See *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].)

We recognize that the mere fact that more services could have been provided does not render the Department's efforts unreasonable. (See *In re Misako R.* (1991) 2 Cal.App.4th 538, 547 [3 Cal.Rptr.2d 217].) Here, however, reunification was not going to be accomplished without visitation, and the social worker knew that Alvin would be unlikely ever to consent to visitation without conjoint therapy. And conjoint therapy was not going to be accomplished unless some effort were made to get Alvin into individual therapy.

Father had done all that was required of him under the plan. Thus, *one* service, getting Alvin into eight sessions of individual therapy, stood in the way of all measures remaining under the reunification plan, and the Department submitted no evidence of having made a good faith effort to bring those sessions about. And it ignored the court's first order eliminating the eight-session requirement. Further, there was no evidence. with regard to *when* the referral to Alvin's unavailable therapist was made in the first instance. There was no evidence with regard to *when* he was placed on a waiting list. And there was no evidence with regard to any follow-up by the Department to move things along or to assist the overwhelmed maternal grandmother in any respect other than a referral to a therapist with a waiting list.

And yet, time was *critical*. The longer parent and child live with no visitation, the less likely there will ever be any meaningful relationship. (*In re Monica C., supra,* 31 Cal.App.4th at p. 307.) Under such circumstances, we cannot find that substantial evidence supports the finding that reunification services were reasonable.

When it appears at the six-month review hearing that a parent has not been afforded reasonable reunification services, the remedy is to extend

the reunification period, and order continued services. (*In re Monica C.,* *supra,* 31 Cal.App.4th at p. 310; Welf. & Inst. Code, § 366.21, subd. (g)(1).) ■ In this case, although the juvenile court found the services to have been reasonable, it nevertheless ordered an additional six months of services, just as it would have done, had it found that reasonable services had not been provided. Unless the order is reversed, however, the prejudice to father from the ruling will come later, at each successive phase of the proceedings. (See *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1015-1016 [70 Cal.Rptr.2d 603].)

It may already be too late to promote regular visitation by the 12-month review, when permanency planning begins. (See *In re Nicholas B., supra,* 88 Cal.App.4th at pp. 1138-1139; Welf. & Inst. Code, § 366.21, subd. (f).) And without visitation, father may face termination of reunification efforts, even though he has done everything required of him under the plan. (See Welf. & Inst. Code, § 366.21, subd. (g).) We must, therefore, reverse the finding that reasonable services were offered.

■ Father also contends that there was insufficient evidence to support the juvenile court's finding that Alvin's return to father would create a substantial risk of detriment to his physical or emotional well-being.[3] We disagree.

The juvenile court based its finding in great part upon Alvin's demeanor while testifying that he was afraid to return to his father. The court concluded that Alvin was "pretty . . . emotional about the issue" of returning to his father, that he was frightened and confused, and that his emotional difficulties needed resolving in therapy before he returned. We must accept the juvenile court's assessment of Alvin's demeanor, its resolution of his credibility, and the reasonable inferences it has drawn as a result. (See *In re Walter E.* (1992) 13 Cal.App.4th 125, 139-140 [17 Cal.Rptr.2d 386].)

The juvenile court also heard the testimony of the social worker, who had observed Alvin monthly since November 2001. It was his opinion that there was a substantial risk to Alvin's emotional well-being if returned to his father at that time, because Alvin did not want to live with his father.

Insufficient counseling to address Alvin's emotional trauma, his expression of fear and desire not to return to father's custody, and the opinion of the social worker that returning Alvin would have an adverse effect on his emotional well-being, provide substantial evidence of substantial risk of

---

[3]Absent such a finding by the preponderance of the evidence at the six-month review hearing, a child must be returned to the parent. (See Welf. & Inst. Code, § 366.21, subd. (e).)

detriment to Alvin's emotional well-being. (See *In re Joseph B.* (1996) 42 Cal.App.4th 890, 902 [49 Cal.Rptr.2d 900].)

Father contends that the finding should nevertheless be reversed in order to hold the Department accountable, because the absence of reasonable services to address visitation and Alvin's counseling needs have put him in a "Catch 22"[4] in which there will always be evidence of detriment.

■ The remedy for a failure to provide reasonable reunification services is an order for the continued provision of services, even beyond the 18-month review hearing. (*In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211-1215 [31 Cal.Rptr.2d 75].)[5] The remedy is not to return the child to the parent in spite of a finding of a substantial risk of detriment to his emotional well-being. (See *In re Joseph B., supra,* 42 Cal.App.4th at p. 899.) The purpose of child dependency proceedings is to serve the child's best interests, not to dispense punishment. (See *Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 974 [98 Cal.Rptr.2d 741].)

### DISPOSITION

The juvenile court's order of June 7, 2002, is reversed only with regard to its finding that appellant received reasonable reunification services, and that finding is vacated. The matter is remanded to the juvenile court to enter a new order finding that reasonable services were not provided, and to order the Department to provide such services. In all other respects, the order is affirmed.

Vogel (C. S.), P. J., and Curry, J., concurred.

---

[4]"[A] paradoxical rule postulated in the novel *Catch 22* (1961, released as a film in 1970), by Joseph Heller . . . ." (Oxford English Dict. (2d ed. 1989) p. 973.)

[5]The *Daniel* court concluded that the juvenile court also had the power to postpone permanency planning if necessary. (See *In re Daniel G., supra,* 25 Cal.App.4th at p. 1214; but see *Mark N. v. Superior Court, supra,* 60 Cal.App.4th at p. 1017, fn. 10.)