Filed 2/25/14  In re Jermaine W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JERMAINE W., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064691 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J518430) |
| N.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

N.H. appeals following the 12-month review hearing in the dependency case of her son, Jermaine W.  N.H. contends no substantial evidence supports the juvenile court's finding that returning Jermaine to N.H.'s home would create a substantial risk of detriment to him.  We affirm.

BACKGROUND

In early June 2012, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition (Welf. & Inst. Code, § 300, subd. (b))[1] for 10- and-one-half-year-old Jermaine, alleging as follows:  In April, N.H. agreed to participate in voluntary services after Jermaine's toddler brothers[2] were found to have healing burn scars.  She did not participate in those services and was only allowed supervised contact with the brothers.  She twice failed to drug test and declined family counseling offered by Jermaine's school.  When she took Jermaine and a young sibling panhandling door to door, Jermaine begged for money and burglarized a home.  N.H. accepted a stolen cell phone from Jermaine and used the phone.  Jermaine was on the streets, unsupervised, late at night and was arrested for assault with a deadly weapon (throwing rocks at homeless persons), criminal gang activity and curfew violations.  In May, during an assessment at county mental health, N.H. tested positive for marijuana.

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]     N.H. had three minor children who were younger than Jermaine, two who were older and one adult child.  N.H.'s child welfare history began years before Jermaine's birth.

After being released from juvenile hall, Jermaine was detained in Polinsky Children's Center, then in a group home.  N.H.'s whereabouts were unknown until June 19, 2012, when the Agency discovered she had been arrested and jailed on charges of second degree burglary, forgery and various theft offenses.[3]  N.H. was convicted of the charges and placed on probation.  In July, she tested positive for marijuana and claimed she had a medical marijuana card.[4]

In the group home, Jermaine was prone to verbal and physical outbursts.  He was defiant and encouraged defiance in his peers.  He left the group home without permission and encouraged other residents to join him.  During one of his absences, Jermaine and his companions threw rocks at passing cars, hit cars with sticks and hid until the police arrived and returned them to the group home.  This behavior led to Jermaine's transfer to a different group home in July 2012.  Approximately two weeks later, at 3:00 a.m., Jermaine began yelling in an attempt to wake up other group home residents.  He spit at staff members; attempted to punch, bite and "head butt" them; and threatened to kill residents and staff members.

In July 2012, the court made a true finding on the petition.  In August, the court ordered Jermaine removed from N.H.'s custody and placed in a group home and ordered reunification services.

_____

[3]     N.H.'s criminal history began before Jermaine was born.

[4]     Later, N.H. said the card expired in December 2012.

By November 2012, Jermaine was allowed eight-hour unsupervised visits with N.H. away from the group home. In December, N.H. tested positive for marijuana and methamphetamine. She claimed she had not used methamphetamine since 2009 and said marijuana alleviated the fatigue caused by her prescribed psychotropic medication.[5] In January 2013, N.H. tested positive for marijuana at a low level.

By January 2013, Jermaine's behavior had improved, as had his academic performance. He benefited from the structured group home environment and weekly therapy. He received psychiatric care and was prescribed medication to treat his disruptive behavior, temper outbursts, verbal and physical aggression and insomnia. In January, the group home closed and Jermaine was moved to another group home.

In April 2013, N.H. stopped participating in services without having completed any of the objectives of her case plan. In June, she refused to drug test. She repeatedly lost the bus passes the Agency provided, repeatedly lost her cell telephone and said this was why she could not participate in services. She forfeited her public assistance for approximately one month because she was angry with staff members at the family resource center and would not return to have her application processed. As of June, she had not followed up on the Agency's housing referrals. Instead, she stayed with various friends and family members, and in motels. Her communication with the Agency was inconsistent.

---

[5]     N.H. suffered from depression and anxiety.

In June 2013, N.H.'s visitation was limited to the grounds of Jermaine's group home, in part because of N.H.'s lack of communication with the Agency. After this, his disruptive and defiant behavior increased rapidly. He physically assaulted group home staff members, verbally threatened staff members and residents, destroyed property and refused to follow rules. Despite being intelligent, he often failed to complete school work. The social worker believed Jermaine was "motivated when he knows [N.H.] is improving"; group home staff and school personnel had not found any other way to motivate him.

In July 2013, N.H. tested positive for marijuana and amphetamines. The social worker noted that during various meetings, N.H. had appeared as though she might be under the influence of amphetamines; she fidgeted, had difficulty maintaining eye contact, often did not answer questions and exhibited scattered thoughts and speech patterns. Jermaine's siblings reported that N.H. had asked for their urine to submit for testing. Later in July, N.H. obtained a phone to replace one she had lost and Jermaine was again allowed eight-hour unsupervised visits with N.H. away from the group home. N.H. did not take advantage of all the visits she was allowed, often cancelled visits at the last minute and failed to appear for one visit. This upset Jermaine and he acted out with physical aggression, but N.H. believed he should not be upset if she cancelled a visit.

In August 2013, N.H. was arrested, charged with second degree burglary and jailed. She had also failed to appear in court on a drug charge.

At the contested 12-month review hearing in September 2013, the court found, by clear and convincing evidence, that Jermaine's return to N.H. would create a substantial

risk of detriment to his physical and emotional well-being. The court continued Jermaine's group home placement and ordered a permanent plan of another planned permanent living arrangement.

## DISCUSSION

At the 12-month review hearing, "[t]he court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (f).)

N.H. raises several challenges to the detriment finding. First, she contends this case resulted principally from Jermaine's incorrigible behavior, for which she was not to blame, and he would not be at a significantly greater risk of harm if he were moved from foster care to her care. Second, N.H. contends the record does not set forth the details and dates of her alleged criminal acts and she did not solicit Jermaine to burglarize a home as the detention report suggested. Third, N.H. contends there is no evidence she was addicted to methamphetamine, used drugs in Jermaine's presence or that any use affected her parenting ability, and suggests alternate causes for her positive tests and symptoms of illicit drug use. Fourth, N.H. contends the detriment finding cannot be based on her homelessness and poverty, and notes two of her children were living with

6

her.[6] Fifth, N.H. contends there was no evidence her anxiety or depression presented a substantial risk of detriment. N.H. concludes Jermaine could have been returned to her care with family maintenance services, or treated in the juvenile delinquency system.

There are many flaws in N.H.'s arguments. Contrary to her suggestion, the detriment finding was not based simply on her poverty or homelessness, and her claim that she is not responsible for Jermaine's behavior is a simplistic view of a complicated situation. Regardless of the genesis of Jermaine's disruptive and violent behavior, he is troubled and in need of supervision, stability and structure that N.H. is unable to provide.

According to reports preceding the filing of the dependency petition, N.H. sent Jermaine into a home to steal property, or at least accepted a stolen cell phone from him after he told her he had stolen it. N.H. engaged in criminal behavior during the pendency of this case. She has a long-standing history of drug abuse, including giving birth to a child who tested positive for marijuana at birth in 1999. During this case, N.H. used illegal drugs, including methamphetamine, and appeared to be under the influence in meetings with the social worker. N.H. was offered services to address a myriad of concerns, but did virtually nothing. Sadly, she was not reliable even in visiting Jermaine. All of these circumstances constitute substantial evidence (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 974) supporting the finding that placing Jermaine with N.H. would

---

6      N.H.'s nine-year-old and 15-year-old children, who were in her care under a voluntary case plan, had histories of truancy. Jermaine also was truant while in N.H.'s care. When he did attend school, the instability in N.H.'s home and her lack of parenting skills led to Jermaine's disruptive behavior at school. This, in turn impeded his learning.

have created a substantial risk of detriment to his safety, protection, or physical or emotional well-being (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899).

N.H. relies on *In re Precious D.* (2010) 189 Cal.App.4th 1251, which held "parental unfitness or neglectful conduct must be shown in order to assert dependency court jurisdiction under that part of section 300[ subdivision] (b) providing for jurisdiction based on the parent's 'inability . . . to adequately supervise or protect the child.' " (*Id.* at p. 1254.)  That case is distinguishable.  It is too late for N.H. to challenge dependency jurisdiction, and there is ample evidence of her "parental unfitness or neglectful conduct."  (*Id.* at p. 1251.)

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

O'ROURKE, J.

8